FILED

07/05/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2017

**IN RE KENYA H.**

**Appeal from the Juvenile Court for Hamilton County**
**No. 272454     Robert D. Philyaw, Judge**

_____

**No. E2017-00130-COA-R3-PT**
_____

This appeal concerns the termination of a father's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Hamilton County ("the Juvenile Court") seeking to terminate the parental rights of George C. ("Father") to his minor child Kenya H. ("the Child"). After a trial, the Juvenile Court entered an order terminating Father's parental rights. Father appealed. We reverse the grounds of substantial noncompliance with the permanency plan and willful failure to visit, but affirm the ground of wanton disregard. We further affirm that termination of Father's parental rights is in the Child's best interest. The judgment of the Juvenile Court is affirmed, in part, and reversed, in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Emily Brenyas, Chattanooga, Tennessee, for the appellant, George C.

Herbert H. Slatery, III, Attorney General and Reporter, and, Kathryn A. Baker, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born to Father and Ann. H. ("Mother") in July 2014. The Child was born at home. Mother gave the Child to relatives. In September 2014, DCS petitioned for and was granted temporary legal custody of the Child. In November 2014, the Juvenile Court adjudicated the Child dependent and neglected. In October 2014, Father signed on to a parenting plan. Father was informed that he needed to establish paternity in order to visit with the Child. Father then disappeared. DCS reestablished contact with Father when he was incarcerated on September 9, 2015. Judgment later was entered against Father on evading arrest, driving on a suspended/revoked license, and failure to appear. Father remained incarcerated through March 10, 2016. While in jail, Father worked on certain of his permanency plan responsibilities. For example, Father took part in parenting and anger management classes. On June 24, 2016, DCS filed a petition seeking to terminate Father's parental rights to the Child. Trial was held in October 2016, and Father's counsel was present but not Father.

Katherine Blackwell ("Blackwell"), the DCS employee supervising visits between Father and the Child, testified that Father's first supervised visit occurred on March 29, 2016. Blackwell stated that Father was "kind of standoffish" and that "we actually had to end the visit a little early because the child was crying uncontrollably to the point to where she was gagging." After Father missed three visits in August 2016, the visitation was removed from Blackwell's schedule.

Kalia Williams ("Williams"), a former family service worker for DCS who worked on the Child's case, testified as follows:

> Q. Could you please tell the Court how [the Child] came into the custody of the Department, please?
> A. Yes, ma'am. [The Child] was born in-home July 14th of 2014. [The Child] was then given to a relative of [Father's], I want to say.
> THE COURT: Did you say born at home?
> THE WITNESS: Yes, sir.
> A. The baby did not have any identification. She didn't have a birth certificate, insurance card or anything like that. And the guardian that she had at the time needed to have her seen for medical treatment and was unable to, so she took her to the Rhea County office of Department of Children's Services and divested custody because she couldn't get medical treatment for her, and then that's when I got the case.

-2-

Q. Okay.  So how did she go from being in Rhea County DCS to Hamilton County DCS?

A. Because I had a prior -- a case already open on the siblings.  The mother had an open case with the Department, so the child was transported down here.

Q. Okay.  And when did you first make contact with the parents in this case?

A. My first contact with [Mother] was in September of 2014.  She was here on the case of her children, so that was my first contact with her.  And my first contact with [Father], I want to say, was maybe November of 2014.

Q. Now, at the time that [the Child] first came into custody, was [Father] her legal father?

A. Yes.

Q. They had already established that?

A. Oh, no.  I'm sorry. DNA had not been established yet.

Q. Okay.  Was he holding himself out to be her father?

A. Yes.

Q. And how did you become aware of that?

A. He stated that he was the father, and [Mother] also stated that he could be the father of the baby.

Q. Did [Mother] or [Father] ever tell you that they were living together at the time that their child was born?

A. Yes.

Q. Did [Mother] or [Father] ever tell you how the child came to be born at home rather than in a regular hospital setting?

A. Speaking with [Mother], she told me she had the baby at home due to her prior involvement with the Department, she was fearful that the Department would take her child away from her, so she didn't want to have the baby in the hospital.  And she also told me that [Father] had been abusive to her, would not allow her to go to a hospital to have the baby.

Q. Okay.  Let's talk about that.  What disclosures did [Mother] make to you regarding the alleged conduct of [Father]?

A. [Mother] told me that [Father] had beat her on several occasions.  She showed marks on her body, on her arms, on her legs, on her right eye.  She stated that [Father] had hit her with the plug of a dryer, the socket part had hit her in her face and caused her to have partial blindness in her right eye.  Yeah, that's what she told me.

Q. At any time, did [Mother] discuss with you that she was being held captive?

A. She did.  When I finally saw her again in September, we did talk about the length of time that she was absent from the other children's case.  She

-3-

stated that [Father] was pretty much holding her against her will, would not let her come to visitations or speak to anybody outside of that home regarding him or the other two children.

Q. Okay. And during your involvement in this case, did the parents maintain contact with you?

A. Not regularly.

Q. What efforts did you make to maintain contact with the parents?

A. As far as [Mother] is concerned, I know she had a Facebook account, so I would speak to [Mother] as often as I could via Facebook. [Father], the only number I had for him was his mother's number. That's the only address I initially had, so I would try to do contact that way. I'd try to call. I would send contact letters. Go by the house, [Father] wasn't there, or [Father's] mother would say that he was out of town. She was unaware of where his whereabouts were.

Continuing her testimony, Williams stated:

Q. Okay. As far as [Father] is concerned, what were his specific tasks and responsibilities under the first plan?

A. [Father] was to establish paternity of [the Child] through DNA testing, obtain and maintain housing for a period of six months, participate in domestic violence counseling, participate in alcohol and drug assessment and follow all recommendations, sign required releases, have a mental health evaluation, to address concerns of anger management and depression and follow those recommendations, maintain legal verifiable income and provide verification, adhere to no contact order with [Mother], and pay child support as ordered.

Q. So what, if any, tasks or responsibilities did [Father] complete while you were involved with this case?

A. [Father] did have stable housing. He was residing with his mother in the home with her. He did eventually establish paternity of [the Child]. He participated in a parenting class while he was in Silverdale. He participated and completed anger management and an alcohol and drug education class while in Silverdale.

On cross-examination, Williams testified:

Q. When [Father] reappeared, did he offer any explanation of what had happened, where he was, where he had been?

A. He did.

Q. What was it?

-4-

A. [Father] stated that he was out of town and was being held against his will by family members, stated that they would not allow him to leave the home. In some kind of way, he got -- he escaped and was able to come back down to Chattanooga.

Q. Okay. At that time, was he on his medication?

A. I do not believe he was.

Q. Okay. Can you describe what it's like to talk to [Father] when he's not on his medication?

A. [Father] is very paranoid. [Father] has a lot of extreme stories regarding his circumstances. [Father] believes there are people out to kill him and that people are listening in on conversations, digging up holes in his yard, and just a lot of bizarre activities.

Q. Okay. So when he is on his medications, is it fairly obvious?

A. Yes.

Q. Okay. And in the spring when he got out of jail, was he -- could you tell if he was on his medication or not?

A. Yes.

Q. My concern is that you said he's not -- he did not follow up with Mental Health Co-op. Where were his meds coming from?

A. I have no idea. I don't believe that he was on any type of medication. Oh, I'm thinking prior. Once he got, I don't -- he was released with medication from Silverdale, he had a certain supply of medication that they released him with, and he was to follow up, but he never did.

Q. To your knowledge?

A. To my knowledge, he never did.

Mother testified. Regarding Father's conduct toward her while she was pregnant with the Child, Mother stated:

Q. So let's talk about that. What all has [Father] done to you?

***

A. She was in my stomach, I was pregnant with her, and all these scars, he beat me with extension cords. My leg, I have scars all on my leg. He messed my eye up. I can't see out of it. I'm legally blind in this eye. And I went to the doctor and they said I have cataracts because of him hitting me with the dryer cord and it messed my eye up. Then I had to have [the Child] at home. I never went to the hospital. I had her at home. He wouldn't let me go to the hospital because he don't want no cops or nothing seeing scars on my arms so he won't go to jail.

-5-

Q. [Mother], did [Father] know that you were pregnant with his child?
A. Yes, he did. He pushed me down some steps and I landed directly on my stomach, and he just kept on whipping me, beating me with extension cords, tied me up, duct-taping me, everything. But he will sit there and lie to you about he didn't do nothing to me, but he did.
Q. Was he holding you captive at home?
A. You might as well say yeah, he was. He wouldn't let me talk to my family. That's why [J.] and [B.], my other kids, got taken from me, because I was with him.

Diana Sutton ("Sutton"), a family service worker with DCS, testified. Sutton became involved in the present case in May 2016. Sutton testified:

Q. Are you aware of anything that would have prevented [Father] from visiting [the Child] after he was released from incarceration?
A. I came -- I got this case in May. He was visiting, and then in June he left and went to Georgia and stayed for about a month, or maybe over a month, June and July. I didn't know where his whereabouts was, and his mom said he had went to Georgia to live with his dad to find a job -- or to stay with his dad to find a job. So other than that, no.
Q. Would you say he maintained contact with you?
A. No, he didn't. I always spoke with his mother.
Q. The mother was always the go-between?
A. Yes.
Q. Have you ever been out to [Father's] residence?
A. I have not.
Q. And since you have been on this case, have the parents made any progress or changes in their circumstances that would make it appropriate for [the Child] to return to them?
A. No.
Q. As far as [Father] is concerned, what are the barriers to reunification?
A. Mental health stability.

***

Q. And is [the Child] currently placed in a pre-adoptive home?
A. She is.
Q. Who is she in the home of currently?
A. William [E.] and Charlotta [E.].
Q. Okay. How is she doing now?

-6-

A. She's doing wonderful. She's happy. The family is just good to her. She doesn't know any other family but the [E's].

The Juvenile Court took the case under advisement. In December 2016, the proceedings resumed. Father was present at this hearing and testified as follows:

THE COURT: Okay. So you heard. You've been here the whole time. You heard what's been represented to the Court, is that you no longer want to contest the petition for termination against you that the Court's heard proof on, and, further, that you believe it's in the child's best interest for your parental rights to be terminated so that the child can be adopted. You've heard all of that said?
[FATHER]: Yes, sir.
THE COURT: And is that your position today?
[FATHER]: Yes, sir.
THE COURT: And have you had time to think about that and speak to your attorney?
[FATHER]: Yes, sir.

In December 2016, the Juvenile Court entered its final judgment terminating Father's parental rights to the Child based upon the following grounds: 1) substantial noncompliance with the permanency plan; 2) abandonment by incarcerated parent for failure to visit; and, 3) abandonment by incarcerated parent for wanton disregard. The Juvenile Court found also that termination of Father's parental rights is in the Child's best interest. The Juvenile Court found and held, as pertinent:

**Abandonment by Incarcerated Parent**

The State has established the ground of Abandonment by Incarcerated Parent, pursuant to T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv), by clear and convincing evidence as to Respondent, [Father].
28) Respondent, [Father], was incarcerated part, or all of, the four (4) months prior to the filing of the petition. [Father] became incarcerated on September 9, 2015 and remained incarcerated until March 10, 2016.
29) During the four (4) months preceding his incarceration, there is no question that he did not visit the child, as his first visit with the child was not until March 29, 2016. FSW Kalia Williams testified that she requested that prior to visitation beginning between [Father] and the child, that he submit to a DNA test to determine if he was the father of the child or that he establish paternity in some other way. FSW Kalia Williams testified that she offered him assistance with obtaining the DNA test;

-7-

however, [Father] failed to cooperate with the Department and his whereabouts became unknown until he was arrested and incarcerated. It was during that time that the Department was able to obtain a DNA sample from [Father] for the purpose of establishing paternity pursuant to his permanency plan and as a condition precedent scheduling visitation with the child.

30) [Father] chose to discontinue his contact with the Department despite signing a permanency plan and agreeing that he would establish paternity for the child. Not only did he fail to make himself available for the DNA test, but he failed to make himself available to visit the child due to his absence from this case. Establishing paternity was not only something that was within the control of [Father], but something that the Department would have been able to assist him in accomplishing. Once [Father] became incarcerated, the Department assisted him with the establishment of paternity and scheduled visitations with him and the child upon his release. However, based upon [Father's] willful failure to participate in the DNA/establishment process in the four months prior to his incarceration, the Court should find by clear and convincing evidence that his failure to visit was in fact willful.

31) The Respondent, [Father], has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

32) Specifically, [Father] beat the mother severely while she was pregnant with the subject child, causing her to have various injuries including partial blindness in her eye from hitting her in the face with the socket of a dryer cord. [Father] held the mother hostage at the home without allowing her to seek medical attention for her injuries and medical attention to assist with the birth of the child. Following the child's removal into foster care, [Father] failed to participate with the Department in working towards reunification and failed to take steps to legitimate and support the child. Then in September 2015, [Father] was arrested for driving on a suspended license, evading arrest and for failure to appear, which resulted in his incarceration until March 2016. Following his release, he failed to maintain contact with the child and Department. [Father] has significant mental health concerns that require medication and yet [Father], despite acknowledging to Department staff that he needs help with sobriety and his mental health, has taken no steps to remedy or address these conditions. Additionally, [Father] failed to appear for trial despite the Department's attempts to transport him to the hearing. All of these acts, alone and in combination, evidence a wanton disregard by [Father] for the welfare of the child to such a degree that it would be detrimental to the child to be placed in the care of the Respondent.

33) FSW Kalia Williams testified that [Father] held himself out to be the father of the child to her, and [Mother] testified that she resided with [Father] during the birth of the child. There is no question that [Father] knew about the mother's pregnancy when he chose to severely beat the mother, and that he knew about the existence of the child when he held the mother against her will, denying her an opportunity to seek medical care for the child at the time of the child's birth. There is no question that [Father] knew that the child was placed into foster care and was in need of a parent once the child entered custody, yet he failed to cooperate or establish paternity or visit with the child. Further, [Father] chose to engage in criminal behavior which caused him to be incarcerated for a period of six months, again taking him away from the child.

34) Based upon [Father's] knowledge of the child during the mother's pregnancy and his behaviors during and following the mother's pregnancy that constitute a wanton disregard for the child, the Court finds that he abandoned the child by wanton disregard by clear and convincing evidence.

## Substantial Noncompliance with Permanency Plan

The State has established the ground of Substantial Noncompliance with Permanency Plan, pursuant to T.C.A. §§ 36-1-113(g)(2) and 37-2-403(a)(2), by clear and convincing evidence as to both Respondents.

***

38) The Department developed three permanency plans with [Father] over the course of the child's custodial episode. The first permanency plan was developed on October 16, 2014 and was later ratified by the Court as finding the responsibilities in the plan were reasonably related to the reasons that necessitated foster care. The Respondent, [Father], participated in the development of the plan in person.

39) The Department provided a copy of the Statement of Responsibilities outlining the responsibilities of [Father] as follows: establish paternity for the child; obtain safe, stable housing; participate in domestic violence counseling and/or education; adhere to the no contact Order with [Mother]; submit to a mental health evaluation and follow all recommendations; provide proof of legal, verifiable income; visit the child regularly; maintain regular contact with the Department; and pay child support. [Father] acknowledged receipt of the permanency plan and the Criteria for Termination of Parental Rights.

***

43) [Father] made absolutely no progress on his permanency plan until he was incarcerated from September 9, 2015 to March 10, 2016. While incarcerated, DNA was obtained to accomplish the goal of establishment and he attended an alcohol and drug education class and anger management class. However, upon his release, he failed to follow through with the recommendations of his alcohol and drug assessment and failed to follow through with mental health treatment despite his admission to Department staff about needed assistance maintaining sobriety and needing to have his mental health medication reevaluated. Despite the Department's reasonable efforts to assist [Father], he failed to show proof of stable housing and income, failed to visit regularly with the child, failed to show proof of alcohol and drug treatment and mental health treatment, and failed to maintain contact with the Department. [Father] made no efforts to place himself in a position to parent the child or develop a meaningful relationship with the child despite the Department's assistance.

44) The Department entered into a permanency plan with [Father] because he was not only identified as the father of the child by [Mother], but he himself, held himself out to be the father of the child. The Department required [Father], as they do in all cases, to establish paternity of the child in an effort to aid in reunification. The Department then assisted in the establishment of paternity. Not only did [Father] have from the time that the child entered foster care to complete the plan, he could still be working on his responsibilities now; however, he stopped communicating with the Department and failed to appear at the hearing that was to determine if his rights would be forever severed to the child.

***

49) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted as to Respondent, [Father], because he has shown brutality, abuse or neglect towards both the subject child and towards the child's mother, [Mother]. [Mother] testified that she was a victim of domestic violence at the hands of [Father], particularly while pregnant with the child, while giving birth to the child, and immediately following the birth of the child. While [Father] did not appear at trial, [Mother] testified that she believed it would be in the best interest for [Father's] rights to be

-10-

terminated based upon his prior violent behavior towards her and because of his aggressive tendencies.

50) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, as a change of caretakers and home is likely to have a highly negative effect on the child. The child has developed a strong bond with the foster family and removing the child from that home would likely have a negative impact on the child. The child has remained placed in the same foster home since the removal of the child on September 23, 2014, and the child remains bonded to the foster family. The foster family is willing to adopt the child when/if the child becomes available for adoption and is willing to provide a permanent home for the child. DCS FSW Kalia Williams and DCS FSW Diana Sutton, along with [Mother] and [Father], testified that they believed that it was in the best interests of the child for the Respondents' rights to be terminated so that the child could be adopted into the foster home.

Father timely appealed to this Court.

## Discussion

Though not stated exactly as such, Father raises the following three issues on appeal: 1) whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan; 2) whether the Juvenile Court erred in finding the ground of willful failure to visit; and, 3) whether the Juvenile Court erred in finding the ground of wanton disregard. Although not raised by Father, we also must consider whether termination of Father's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re*

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

*Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(I)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than

not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

As pertinent, Tenn. Code Ann. § 36-1-113(g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(1)-(2) (2014 & Supp. 2016).

Regarding abandonment by an incarcerated parent, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\*\*\*

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the

parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2014 & Supp. 2016).[4]

We first address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan. Father states on appeal that the "final Plan offered at trial was dated March 17, 2016, was signed by the Father, and includes a Statement of Responsibilities, but was never ratified by any Court." Father also argues that, considering Father's mental health problems, there was insufficient time of only three months between the creation of the final permanency plan and the filing of the petition. For its part, DCS concedes this ground and does not defend it on appeal. Our review of the evidence in the record on appeal reflects that the evidence is not clear and convincing so as to support establishing this ground for termination. We, therefore, reverse the Juvenile Court's finding of the ground for termination of substantial noncompliance with the permanency plan.

We next address whether the Juvenile Court erred in finding the ground of willful failure to visit. Father argues that his pre-incarceration failure to visit the Child cannot be regarded as willful because he was barred by DCS from visiting the Child until he established himself as legal father of the Child. Father also argues that "[d]espite the FSW's testimony that Father claimed to have been held against his will by family during the relative time period, and the FSW's description of Father's paranoid state . . . the Department offered no evidence that Father was mentally well enough to present himself to be tested." DCS, on the other hand, argues that Father's failure to visit actually was the result of his deliberate choice to disappear in order to avoid facing justice on criminal charges. This Court has discussed willfulness as follows:

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no

---

[4] Effective July 1, 2016, Tenn. Code Ann. § 36-1-102(1)(A)(iv) was amended to alter the manner by which the four month period is calculated. The petition seeking to terminate parental rights in this case was filed on June 24, 2016. DCS contends that the July 2016 amendments are inapplicable. For reasons we will discuss, our holding on this ground does not hinge on whether the July 2016 amendments apply here.

attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citations and footnotes omitted).

Establishing Father's willful intent not to visit is necessary for this ground. While Father's alleged excuses do indeed appear poor, there is insufficient evidence in the record upon which to make a clear and convincing determination as to Father's intent not to visit. As discussed, the evidence in the record on this issue of willful intent shows, at best, only various equally possible reasons for Father's failure to visit but not all of these possible reasons rise to the level of a willful failure to visit. This is so whether the aforementioned July 2016 statutory amendments are applicable or not as we find independent grounds for reversal. We, therefore, reverse the Juvenile Court in its finding the ground for termination of willful failure to visit.

We next address whether the Juvenile Court erred in finding the ground of wanton disregard. Father argues that there is no nexus between Father's alleged assault of Mother and the conduct which ultimately saw Father incarcerated. That, however, is not dispositive of this issue. This Court has stated:

An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child

*In re Audrey S.*, 182 S.W.3d at 866.

We have stated regarding violence against pregnant mothers: "There can be no doubt that a violent physical attack on the mother of an unborn child amounts to wanton disregard for that child's welfare for several reasons (danger to the child and danger to the mother) and may support the termination of the attacker's parental rights." *In re T.M.H.*, No. M2008-02427-COA-R3-PT, 2009 WL 1871873, at \*7 (Tenn. Ct. App. June 29, 2009), *Rule 11 appl. perm. appeal denied Sept. 18, 2009*. Mother testified to the

abuse perpetrated by Father upon her while she was pregnant with the Child. The Juvenile Court credited Mother's testimony. The abuse described by Mother was of an especially cruel nature and directly imperiled the Child. The evidence does not preponderate against any of the Juvenile Court's findings relevant to this issue. We find and hold, as did the Juvenile Court, that the ground of wanton disregard is established by the standard of clear and convincing evidence.

Although not raised by Father, the final issue we address is whether the Juvenile Court erred in finding that it is in the Child's best interest for Father's parental rights to be terminated. As already set out in this Opinion, the Juvenile Court made findings with respect to Tenn. Code Ann. § 36-1-113(i), and the evidence does not preponderate against these findings. As recounted above, Father's acts of violence and criminal behavior have imperiled the Child already. The Child is in a suitable placement and return to Father would be contrary to the Child's best interest. We find and hold, as did the Juvenile Court, that the evidence is clear and convincing that termination of Father's parental rights is in the Child's best interest.

To conclude, we reverse the grounds of substantial noncompliance with the permanency plan and willful failure to visit. We affirm the ground of wanton disregard. We affirm further that termination of Father's parental rights is in the Child's best interest.

### Conclusion

The judgment of the Juvenile Court is affirmed, in part, and reversed, in part, and, therefore, Father's parental rights are terminated. This cause is remanded for collection of the costs below. The costs on appeal are assessed against the Appellant, George C., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-18-